91 Cal.Rptr.2d 422 (1999)
77 Cal.App.4th 122
J. Michael FLANAGAN, Cross-complainant and Appellant,
v.
Honorine T. FLANAGAN, Cross-defendant and Respondent.
No. B122810.
Court of Appeal, Second District, Division Five.
December 27, 1999.
Review Granted March 22, 2000.
*423 Jerry K. Staub and Patricia Venegas, Glendale, for Cross-complainant and Appellant.
*424 Allen, Matkins, Leek, Gamble & Mallory, Edwin W. Green, A. Kristine Floyd and Bruce W. Hepler, Irvine, for Cross-defendant and Respondent.
GRIGNON, Acting P.J.
Penal Code sections 632 and 637.2 authorize a civil action for treble damages or statutory penalties against an individual who electronically records a confidential communication. In this case, we are concerned with the nature of a confidential communication, the manner in which the statutory penalties are imposed, whether the statutory penalties violate due process and whether punitive damages may be awarded for violation of the statute. A jury found that 24 confidential communications had been electronically recorded and awarded a statutory penalty of $5,000 for each recording. The jury awarded a total of $120,000 in statutory penalties and $1.2 million in punitive damages. The trial court reduced the statutory penalties to $5,000 and struck the punitive damage award. We modify the judgment to increase the statutory penalties and otherwise affirm.

PROCEDURAL BACKGROUND
Honorine Flanagan is the stepmother of Michael Flanagan.[1] On July 1, 1996, Honorine sued Michael and Dale Denels for slander, invasion of privacy, and intentional and negligent infliction of emotional distress. Honorine alleged an additional cause of action against Denels for a violation of Penal Code section 632. On March 10, 1997, Michael cross-complained against Honorine for violations of Penal Code section 632 and intentional infliction of emotional distress. The case was tried to a jury on Honorine's causes of action for slander and intentional and negligent infliction of emotional distress and Michael's cause of action for violations of Penal Code section 632. The jury returned a special verdict in favor of Michael and Denels on Honorine's complaint. On Michael's cross-complaint, the jury found Honorine had electronically recorded 24 confidential communications between Michael and his father, John Flanagan, and awarded Michael $5,000 for each recording, for a total of $120,000. The jury also awarded Michael $1.2 million in punitive damages. The trial court entered judgment on the special verdict. Subsequently, the trial court granted in part Honorine's motion for judgment notwithstanding the verdict, by reducing the statutory penalties to $5,000 and striking the punitive damages. Michael filed a timely notice of appeal.

FACTS
John married Honorine in 1969. Michael and his sister were John's children by a prior marriage. In 1982, John was diagnosed with prostate cancer. In 1992, John began to receive injections of Lupron to inhibit the production of testosterone and the proliferation of cancer cells. In 1993, Honorine began to administer John's Lupron injections. The progression of John's prostate cancer was measured periodically by John's physician by means of a Prostate Specific Antigen (PSA) test.
Until April 1995, it was John's expressed intent to leave his entire estate to Honorine. In April 1995, John contemplated bequeathing one-third of his estate to Michael and his sister. John discussed this at an estate planning meeting with Honorine and their attorneys. Honorine strenuously objected to this proposal and attempted to persuade John to follow his original intention. The attorneys asked Honorine to leave the meeting. John did not change his estate plan at this time.
Honorine confided to Denels that she wanted John to die so that she could take his entire estate. In the summer of 1995, Honorine began injecting John with water instead of Lupron. She also installed a voice activated recording device on their home telephone to discover any suspicions *425 of John concerning her plot or any attempt by John to change his estate plan. She listened to the recorded calls at the end of the day and preserved some of them. Honorine taped multiple telephone conversations between Michael and John. In two of these conversations, Michael warned John about Honorine and discussed tracing community property assets and contacting attorneys. John's caretaker participated in these telephone conversations. In some of these conversations, Michael and John arranged meetings with each other. As to most of the conversations, no evidence was presented as to content.
At the end of 1995, John's PSA readings increased dramatically. Honorine persuaded his physician not to advise John of the increase, so as not to worry him. Honorine confided her plot to Denels, who was concerned she might be implicated in the scheme. Denels secretly recorded her telephone conversations with Honorine. Later, Honorine offered to purchase the recorded conversations from Denels for $200,000.
In the spring of 1996, Michael and John learned of Honorine's plot from Denels. John's physicians began to administer the Lupron injections to John, causing his PSA readings to decrease dramatically. John died of a heart attack on March 18, 1997, without having changed his estate plan. Honorine inherited John's entire multi-million-dollar estate.

DISCUSSION

Standard of Review
"On an appeal from the judgment for defendant notwithstanding the verdict, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict...." (Stubbkfield Construction Co. v. City of San Bernardino (1995) 32 Cal.App.4th 687, 703, 38 Cal.Rptr.2d 413.)

Statutory Interpretation
"In interpreting a statute, we apply the usual rules of statutory construction. `We begin with the fundamental rule that our primary task is to determine the lawmakers' intent. [Citation.] ... To determine intent, "`The court turns first to the words themselves for the answer.'" [Citations.] "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute)...."' [Citation.] We give the language of the statute its `usual, ordinary import and accord significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose.... Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.'" (Kane v. Hurley (1994) 30 Cal.App.4th 859, 862, 35 Cal.Rptr.2d 809.)
"Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1387, 241 Cal.Rptr. 67, 743 P.2d 1323.) `"A statute should be interpreted so as to produce a result that is reasonable. [Citation.] If two constructions are possible, that which leads to the more reasonable result should be adopted.'" (Granberry v. Islay Investments (1984) 161 Cal.App.3d 382, 388, 207 Cal.Rptr. 652.)

Penal Code Sections 632 and 637.2
In enacting the Invasion of Privacy Act (Pen.Code, § 630 et seq.), the Legislature expressly declared "that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and *426 increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. [¶] The Legislature by this chapter intends to protect the right of privacy of the people of this state."
Penal Code section 632 provides: "(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. If the person has previously been convicted of a violation of this section or Section 631, 632.5, 632.6, 632.7, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."
Penal Code section 632, subdivision (c) provides: "The term `confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering ... or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."
Penal Code section 637.2 provides: "(a) Any person who has been injured by a violation of this chapter may bring an action against the person who committed the violation for the greater of the following amounts: [¶] (1) Five thousand dollars ($5,000). [¶] (2) Three times the amount of actual damages, if any, sustained by the plaintiff. [¶] (b) Any person may, in accordance with Chapter 3 (commencing with Section 525) of Title 7 of Part 2 of the Code of Civil Procedure, bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a). [¶] (c) It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

Confidential Communication
Michael contends he is entitled to a $5,000 statutory penalty for each of the 24 confidential communications surreptitiously recorded by Honorine. We consider first whether substantial evidence supports the jury's finding as to all 24 violations. Penal Code section 632 prohibits the nonconsensual recording of a confidential communication. The term "confidential communication" is not defined per se, but it is explained by means of inclusion and exclusion. (Pen. Code, § 632, subd. (c).) Included in the term "confidential communication" is any communication that is carried on in circumstances which objectively indicate that one of the parties to the communication desires it to be confined to the parties. Excluded from the term "confidential communication" is a communication which is made in any circumstance which objectively indicates that the communication may be overheard or reported. From this inclusion and exclusion a definition may be derived: A communication is confidential if (1) it reasonably appears that at least one of the parties desires it to be exclusive to the parties; and (2) the desire for exclusivity is objectively reasonable under the circumstances.
The second part of the definition has sometimes been described as a reasonable expectation of privacy. (O'Laskey v. Sortino (1990) 224 Cal.App.3d 241, 248, 273 Cal.Rptr. 674.) It is of no moment that a party desires confidentiality if that desire *427 is objectively unreasonable. Thus, for example, an inmate may desire confidentiality when he confesses to his brother, but it has been held that individuals in police custody have no reasonable expectation of privacy in their conversations. (People v. Blair (1969) 2 Cal.App.3d 249, 255, 82 Cal. Rptr. 673.) Similarly, one who calls the police department to deliver a bomb threat has no reasonable expectation that the recipient will keep it to himself or herself. (People v. Suite (1980) 101 Cal.App.3d 680, 688, 161 Cal.Rptr. 825.) Likewise, an individual who speaks to a reporter concerning a highly publicized event has no reasonable expectation that the reporter will not divulge the conversation. (Deteresa v. American Broadcasting Companies, Inc. (9th Cir.1997) 121 F.3d 460, 464-465.)
The first part of the definition has engendered much confusion in the appellate cases. Recently, the Supreme Court noted a conflict in the Court of Appeal cases and the fact that it had not yet decided the issue. "Neither in Ribas [v. Clark (1985) 38 Cal.3d 355, 212 Cal.Rptr. 143, 696 P.2d 637] nor in any other case have we had occasion to decide whether a communication may be deemed confidential under Penal Code section 632, subdivision (c) when a party reasonably expects and desires that the conversation itself will not be directly overheard by a nonparticipant or recorded by any person, participant or nonparticipant, but does not reasonably expect that the contents of the communication will remain confidential to the parties. (Compare Coulter v. Bank of America (1994) 28 Cal.App.4th 923, 929, 33 Cal. Rptr.2d 766 and Frio v. Superior Court (1988) 203 Cal.App.3d 1480, 1488-1490, 250 Cal.Rptr. 819 [both holding [Penal Code] section 632 requires only that a party to the conversation reasonably expects it to be private from recording or eavesdropping] with O'Laskey v. Sortino (1990) 224 Cal.App.3d 241, 248, 273 Cal.Rptr. 674 [referring to expectation the conversation would not be `divulged' to third party] and Deteresa v. American Broadcasting Companies, Inc. (9th Cir.1997) 121 F.3d 460, 463-464 [reading O'Laskey v. Sortino, supra, as requiring expectation of secrecy of contents and predicting this court would adopt such interpretation of [Penal Code] section 632].)" (Shulman v. Group W Productions, Inc. (1998) 18 Cal.4th 200, 235, fn. 15, 74 Cal.Rptr.2d 843, 955 P.2d 469.)
As noted by the Supreme Court in Shulman, the Ninth Circuit has also perceived the conflict in the Court of Appeal cases. "California courts have stated two competing formulations of what a party must reasonably expect for a communication to be confidential. In Frio v. Superior Court [(1988)] 203 Cal.App.3d 1480 [250 Cal. Rptr. 819], the California Court of Appeal explained that `under [Penal Code] section 632 "confidentiality" appears to require nothing more than the existence of a reasonable expectation by one of the parties that no one is "listening in" or overhearing the conversation.' [Citation.] The court acknowledged, however, that confidentiality could be construed `more narrowly by defining it as a reasonable expectation that the content of the communication has been entrusted privately to the listener.' [Citation.] In O'Laskey v. Sortino [(1990) 224 Cal.App.3d 241, 273 Cal.Rptr. 674], the Court of Appeal adopted the narrower construction, `distilling' from Frio and other cases `the basic rule that the statute means what it says': courts must examine whether either party `reasonably expected, under the circumstances ..., that the conversation would not be divulged to anyone else.' [Citation.] [¶] The Court of Appeal returned to Frio, however, in Coulter v. Bank of America [(1994)] 28 Cal.App.4th 923 [33 Cal.Rptr.2d 766]: `[T]hat the subject matter might be later discussed has no bearing on whether [Penal Code] section 632 has been violated.' [Citation.] Coulter went on to restate Frio's construction that confidentiality requires nothing more than a reasonable expectation that no one is listening in." (Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at pp. 463-464.)
*428 The Ninth Circuit explained the conflict. "A simple example demonstrates how differently Frio/Coulter and O'Laskey each construe [Penal Code] section 632[, subdivision] (a). Suppose X and Y are hiking in the woods. Y offers to pay X the $5.00 that Y owes X. X tells Y to pay the money to Z, because X owes Z $5.00. When X finds out that Y had taped the conversation, he sues Y. Under Frio, X wins because in the wilderness he had a reasonable expectation that no one overheard their conversation. Under O'Laskey, Y wins, because X had a reasonable expectation that Y would divulge the conversation to Z." (Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at p. 464, fn. 1.)
The Ninth Circuit predicted that when the California Supreme Court resolved the conflict, it would adopt the O'Laskey rationale. "In construing a statute, the California Supreme Court 'turns first,' as it should, `to the words themselves for the answer.' [Citation.] Where the plain meaning of the statute is clear, `courts will not interpret away clear language in favor of an ambiguity that does not exist.' [Citations.] [¶] The problem with Frio is that it transforms a specific exclusion to the definition of `confidential communication' into the definition itself. The first clause of [Penal Code] section 632[, subdivision] (c) explains that '"confidential communication" includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto....' [Citation.] If, therefore, neither party reasonably expects the communication to be confined to the parties, it is not confidential. [¶] The second clause of [Penal Code] section 632[, subdivision] (c) goes on specifically to exclude communications 'made in a public gathering ... or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.' [Citation.] Thus, where someone reasonably expects that the communication may be overheard, the communication is not confidential. Frio implies, however, that unless someone reasonably expects that the communication will be overheard, the communication is confidential. That interpretation renders the first clause of [Penal Code] section 632 surplusage. Under the terms of the statute, if someone does not reasonably expect the conversation to be confined to the parties, it makes no difference under the statute whether the person reasonably expects that another is listening in or not. The communication is not confidential. In California, statutes are construed to give effect to all of their parts and to avoid rendering some words surplusage. [Citation.] Frio, in effect, reads the first clause of [Penal Code] section 632[, subdivision (c),] out of the statute. Because Frio stands at odds with the plain language of the statute, we predict that the California Supreme Court would reject it in favor of O'Laskey." (Deteresa v. American Broadcasting Companies, Inc., supra, 121 F.3d at pp. 464-65.) The test is whether one of the parties has an objectively reasonable expectation under the circumstances that the conversation will not be divulged to anyone else. (Id. at p. 465.)
We find the reasoning of the Ninth Circuit to be persuasive and adopt it for our own. We note also that the Legislature clearly intended a confidential communication to mean something more than any communication made in circumstances not reasonably expected to be overheard or recorded. In addition to eavesdropping (Pen.Code, § 632), the Invasion of Privacy Act (Pen.Code, § 630 et seq.) prohibits wiretapping (Pen.Code, § 631) and interception of cellular radio, cordless and cellular telephones (Pen.Code, §§ 632.5, 632.6, 632.7). These wiretapping and interception statutes prohibit the interception of any communication. Penal Code section 632, on the other hand, prohibits the recording of only confidential communications. Moreover, the requirement of a confidential or private communication comports *429 with the underlying rationale for the electronic eavesdropping prohibition. "While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or a mechanical device. [Citation.] [¶] ... [S]uch secret monitoring denies the speaker an important aspect of privacy of communication  the right to control the nature and extent of the firsthand dissemination of his statements." (Ribas v. Clark (1985) 38 Cal.3d 355, 360-361, 212 Cal.Rptr. 143, 696 P.2d 637.)
"Application of the statutory definition of `confidential communication' turns on the reasonable expectations of the parties judged by an objective standard and not by the subjective assumptions of the parties." (O'Laskey v. Sortino, supra, 224 Cal.App.3d at p. 248, 273 Cal.Rptr. 674.) In determining the reasonable expectations of the parties, we look to the circumstances of the communication. Such circumstances include the nature of the communication, the relationship between the parties, the means of communication and the place. (Cf. Wilkins v. National Broadcasting Co. (1999) 71 Cal.App.4th 1066, 1080, 84 Cal.Rptr.2d 329.)
We apply the rule of an objectively reasonable expectation of exclusivity to the 24 telephone conversations between Michael and John found by the jury to be confidential communications. We note first the father-son relationship and the fact that the conversations took place on the telephone. These circumstances certainly militate in favor of a finding of confidentiality. However, all telephone conversations between a father and son are not confidential. We must look also to the nature of the communication, i.e., its content. As to 17 of the telephone conversations between Michael and John, no evidence was presented as to the content of the conversation. We conclude there is no substantial evidence that these communications were confidential within the meaning of Penal Code section 632. Five of the conversations concerned logistics, i.e., setting and confirming appointments, seeking directions, and asking to have the guard at the entry gate alerted. There is certainly no evidence that either Michael or John desired these conversations to be kept between themselves. We conclude that there is also no substantial evidence that these communications were confidential within the meaning of Penal Code section 632.
Taped transcripts of the remaining two conversations were provided to the jury. These transcripts established that the conversations concerned the retaining of a divorce attorney for John and investigations into community property assets which Honorine may have misappropriated. The content of these conversations together with the relationship of the parties and other surrounding circumstances clearly support a finding of confidentiality. The fact that John's caretaker also participated in these conversations does not preclude a finding of confidentiality. She was another party to the communication and her relationship to John permits a finding of confidentiality.
In summary, substantial evidence supports a finding of only two confidential communications which were surreptitiously recorded by Honorine. The trial court should have granted Honorine's motion for judgment notwithstanding the verdict as to the other 22 telephone conversations.

Statutory Penalty
The jury awarded Michael a $5,000 civil penalty for each of the 24 confidential communications recorded by Honorine. The trial court determined Michael was entitled to only a single $5,000 penalty. Michael contends he is entitled to a statutory *430 penalty for each violation of the statute. We agree.
The statute provides that a person who has been injured by "a violation" of the Invasion of Privacy Act may recover the greater of $5,000 or treble damages. The person injured is entitled to the statutory penalty without proof of actual injury. Each nonconsensual recording of a confidential telephone conversation by a third party constitutes a violation of the Act. The right to an award of the statutory penalty "accrues at the moment of the violation...." (Ribas v. Clark, supra, 38 Cal.3d at p. 365, 212 Cal.Rptr. 143, 696 P.2d 637.) Thus, if a person records more than one confidential communication without the consent of the parties, the individual has violated the statute more than once and the person injured is entitled to a statutory penalty for each violation. The statutory provisions are straightforward and unambiguous. Interpreting the statute to provide for only a single penalty would permit a violator to repeatedly invade the privacy of another without fear of additional sanction. This could not have been the intent of the Legislature.

Due Process
Honorine responds that if we construe the statute to require the imposition of a $5,000 penalty for each violation, the statute violates her constitutional right to due process. "In the exercise of its police power a Legislature does not violate due process so long as an enactment is procedurally fair and reasonably related to a proper legislative goal." (Hale v. Morgan (1978) 22 Cal.3d 388, 398, 149 Cal.Rptr. 375, 584 P.2d 512.) "It is equally well accepted that a state may impose reasonable penalties as a means of securing obedience to statutes validly enacted under the police power." (Ibid.) However, "[c]ourts have consistently assumed that 'oppressive' or `unreasonable' statutory penalties may be invalidated as violative of due process." (Id. at p. 399, 149 Cal.Rptr. 375, 584 P.2d 512.) Therefore, we must examine Penal Code section 637.2 to determine whether, either as enacted or as specifically applied, the penalties authorized are reasonable and proper or arbitrary and oppressive.
We are guided by the Supreme Court decision in Hale v. Morgan, supra, 22 Cal.3d 388, 149 Cal.Rptr. 375, 584 P.2d 512, concerning the constitutionality of penalties authorized under Civil Code section 789.3. Civil Code section 789.3 prohibits a landlord from willfully interrupting or terminating a tenant's utility service with the intent to terminate the tenant's occupancy. Any landlord who violates Civil Code section 789.3, subdivision (b) is liable to the tenant in a civil action for the tenant's actual damages and, in addition, $100 for each day the tenant is deprived of utility service.
In Hale, the Supreme Court concluded that the statutory penalty assessed under Civil Code section 789.3 could be unconstitutional in certain instances because it was mandatory in amount and potentially unlimited in duration, even where the landlord had done nothing after the initial wrongful termination of utility service except fail to restore it. (Hale v. Morgan, supra, 22 Cal.3d at p. 399, 149 Cal.Rptr. 375, 584 P.2d 512.) The Supreme Court noted that the statute did not provide any discretion to the trier of fact in fixing the penalty. (Ibid.) Moreover, the amount of the penalty was fixed by the mathematical formula, even though the statute applied to a broad spectrum of culpable conduct and widely divergent resulting injuries. (Ibid.) "The fixed penalties are imposed upon potential defendants who may vary greatly in sophistication and financial strength." (Ibid.) Unlike several federal statutes which require consideration of various ameliorating factors in the assessment of civil penalties, no moderating influences may be considered under Civil Code section 789.3. (Ibid.) "A large corporate landlord which callously and by design pursues a policy of `shock' eviction suffers no greater penalty than the elderly widow of modest *431 means who, dependent on the income from a single unit, ignorant of the penalty provisions of the law, exhausted by the machinations of a wily and recalcitrant tenant, and no longer willing or able to bear the expense of utilities for an occupant who refuses to pay rent, finally terminates the tenant's utility services in order to speed his departure." (Id at pp. 399-400, 149 Cal.Rptr. 375, 584 P.2d 512.) "In our view, a statute which applies such a mandatory, fixed, substantial and cumulative punitive sanction against persons of such disparate culpability is manifestly suspect." (Id at p. 400, 149 Cal.Rptr. 375, 584 P.2d 512.)
The Supreme Court recognized, however, that in the proper factual context, application of the penalty formula of Civil Code section 789.3 could withstand constitutional challenge. (Hale v. Morgan, supra, 22 Cal.3d at p. 404, 149 Cal.Rptr. 375, 584 P.2d 512.) "The imposition of the $100 daily penalty over a limited period may indeed, in a given case, be a perfectly legitimate means of encouraging compliance with law. Furthermore, there are doubtless some situations in which very large punitive assessments are both proportioned to the landlord's misconduct and necessary to achieve the penalty's deterrent purposes. [¶] Where, as here, a penal statute may be subject to both constitutional and unconstitutional applications, courts evaluate the propriety of the sanction on a case-by-case basis. We have said that a statute is presumed to be constitutional and that it must be upheld unless its unconstitutionality `clearly, positively and unmistakably appears.'" (Ibid.)
Similarly, Penal Code section 637.2 may also be subject to constitutional and unconstitutional applications. The $5,000 per violation penalty is mandatory and the trial court has no discretion in fixing the amount of the penalty. Moreover, the amount of the penalty is fixed by a mathematical formula, even though Penal Code section 637.2 applies equally to a broad spectrum of culpable conduct and widely divergent resulting injuries. The potential defendant may be sophisticated, with vast resources and despicable motives. Conversely, the defendant may have the most innocent intentions, no financial ability to pay the penalty and little sophistication. Because Penal Code section 637.2 may be subject to both constitutional and unconstitutional applications, the propriety of the sanction must be evaluated on a case-by-case basis. We presume the statute to be constitutional and must uphold it unless its unconstitutionality clearly, positively and unmistakably appears.
We conclude that under the circumstances of this case, application of the penalty formula of Penal Code section 637.2 to account for each illegally recorded confidential communication is constitutional. Honorine knew her conduct was illegal. Nonetheless, she engaged in a course of despicable criminal conduct which included recording conversations to monitor any interference with her plan to hasten her husband's death and secure his large estate entirely for herself. Of all the conversations Honorine recorded, the calls between her husband and her stepson jeopardized her plan the most. Moreover, Honorine succeeded in preventing John from changing his estate plan to benefit Michael and his sister, and Honorine realized great financial gain from her actions. Michael had no opportunity to mitigate his damages, because he was unaware of the secret recording device. Michael may have lost his father prematurely, was deprived of a potential inheritance, and was required to defend a lawsuit based on the information Honorine illegally recorded. A total penalty of $10,000 awarded to Michael is not excessive under the circumstances of this case. (Compare Coulter v. Bank of America (1994) 28 Cal.App.4th 923, 925, 33 Cal.Rptr.2d 766 [the bank and 11 bank employees awarded $132,000 under Pen.Code, § 637.2, which formerly authorized $3,000 per violation, for 44 conversations a bank technician recorded *432 without consent in anticipation of filing a sexual harassment action].)

Punitive Damages
Michael contends he is entitled, pursuant to Civil Code section 3294, to the punitive damages awarded by the jury in addition to the statutory penalties under Penal Code section 637.2. We disagree.
"[W]hen a new right, not existing at common law, is created by statute and a statutory remedy for the infringement thereof is provided, such remedy is exclusive of all others unless the statutory remedy is inadequate." (Turnbull & Turnbull v. ARA Transportation, Inc. (1990) 219 Cal.App.3d 811, 826-827, 268 Cal.Rptr. 856.) This rule has three parts. First, the statute creates a new right, not existing at common law. Second, the statute provides a statutory remedy. Third, the statutory remedy is adequate. We discuss the three parts in turn.

1. Creation of New Right
In determining whether a statute creates a new right, we consider whether the statute is declaratory of preexisting common law doctrine or includes areas and subject matters of legislative innovation, creating new limitations on actions. (Strauss v. A.L. Randall Co. (1983) 144 Cal.App.3d 514, 518, 194 Cal.Rptr. 520; see also, Turnbull & Turnbull v. ARA Transportation, Inc., supra, 219 Cal. App.3d at p. 827, 268 Cal.Rptr. 856.) It is true that California recognizes a common law action for the intrusion aspect of the tort of invasion of privacy. (Miller v. National Broadcasting Co. (1986) 187 Cal. App.3d 1463, 1481-1487, 232 Cal.Rptr. 668.) "`One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.'" (Id. at p. 1482, 232 Cal.Rptr. 668, emphasis omitted.) Frequently, the invasion of privacy is accomplished by a physical trespass into the territory of another. "Besides the more obvious and traditional crimes where trespass is an element of the offense, Penal Code chapter 1.5, `Invasion of Privacy,' sets forth the penalties for some of the sophisticated forms of intrusion, from eavesdropping to wiretapping. [Citation.] Section 630 states, in pertinent part, that 'The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.'" (Id. at p. 1483, fn. 7, 232 Cal.Rptr. 668.)
The Invasion of Privacy Act is not simply a declaration of the preexisting common law doctrine of invasion of privacy by intrusion. The common law doctrine is both broader and more circumscribed. Some intrusions give rise to a common law action for intrusion, but do not violate the Invasion of Privacy Act. Some violations of the statute do not meet the requirements of the common law doctrine. Moreover, the Invasion of Privacy Act includes areas and subject matters of legislative innovation and creates new limitations on actions. Accordingly, we conclude the Invasion of Privacy Act creates new statutory rights.

2. Statutory Remedy
In addition to criminal penalties and evidentiary sanctions, the Invasion of Privacy Act provides civil remedies for wiretapping and eavesdropping. Penal Code section 637.2 sets forth the civil remedies for a violation of the Act. The person injured by a violation is entitled to bring a civil action for the greater of $5,000 or treble damages. Actual damages are unnecessary. The injured person may also obtain injunctive relief. The statutory *433 remedies do not include punitive damages, but rather an alternative sanction in the form of treble damages. A treble damages award is punitive in nature and is imposed as punishment against a defendant rather than as compensation to the plaintiff. (Troensegaard v. Silvercrest Industries, Inc. (1985) 175 Cal.App.3d 218, 226-227, 220 Cal.Rptr. 712.) Treble damages serve a similar purpose as punitive damages. (Turnbull & Turnbull v. ARA Transportation, Inc., supra, 219 Cal. App.3d at p. 827, 268 Cal.Rptr. 856.) We conclude the Act provides a comprehensive statutory remedy, which does not include punitive damages. (Compare Commodore Home Systems, Inc. v. Superior Court (1982) 32 Cal.3d 211, 214-221, 185 Cal. Rptr. 270, 649 P.2d 912.)

3. Adequacy of the Statutory Remedy
The statutory remedy includes criminal penalties, evidentiary sanctions, injunctive relief, a $5,000 penalty in lieu of actual damages, and treble damages. It excludes only punitive damages. The statutory remedy is adequate. (Compare Orloff v. Los Angeles Turf Club (1947) 30 Cal.2d 110, 113-115, 180 P.2d 321 [statutory penalty of $100 in addition to actual damages is inadequate and does not preclude injunctive relief].) Moreover, if a plaintiff seeks punitive damages, a cause of action for common law invasion of privacy or intentional infliction of emotional distress may be brought, if the elements of those causes of action, including actual damages, can be established. In that case, the plaintiff would be put to an election of treble actual damages or punitive damages. (Marshall v. Brown (1983) 141 Cal. App.3d 408, 418-419, 190 Cal.Rptr. 392.) In this case, no common law tort action was tried to the jury.[2]

DISPOSITION
The judgment is increased to $10,000. As modified, the judgment is affirmed. Costs on appeal are awarded to Michael Flanagan.
ARMSTRONG, J., and GODOY PEREZ, J., concur.
NOTES
[1] For ease of reference, we will refer to the parties by their first names.
[2] We note that Michael proved no actual damages and thus is also not entitled to punitive damages on this ground.